IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 25, 2016 Session

# C.W.H. v. L.A.S.[1]

**Appeal from the Juvenile Court for Hamilton County**
**No. 28546, 28547     Robert D. Philyaw, Judge**

_____

**No. E2015-01498-COA-R3-JV – Filed October 31, 2016**
_____

This is a custody case involving two children.[2]  C.W.H. (Father) and L.A.S. (Mother) modified, by an agreed order, an existing parenting plan for their children, P.H. and V.H. The modification continued Mother as the children's primary residential parent.  Soon thereafter, Father learned that Mother worked in Nevada as a prostitute.  He filed a motion seeking an emergency temporary custody order and a temporary restraining order. The juvenile court magistrate found that a material change in circumstances had occurred.  It changed the identity of the children's primary residential parent from Mother to Father.  Mother appealed to the trial court.  After a hearing, the trial court (1) confirmed the magistrate's decision and (2) designated Father as the primary residential parent.  Mother appealed to this Court.  In the first appeal, we held that the trial court's order lacked a "best interest" analysis.  As a result, we vacated that order and directed the trial court to (1) make a best interest analysis and thereafter (2) enter a new permanent parenting plan.  On remand, the trial court (1) incorporated its past findings, (2) conducted a best interest analysis, and (3) held in Father's favor.  Mother again appeals. We reverse because we hold that the evidence preponderates, in part but significantly, against the trial court's factual findings supporting its judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Vacated in Part and Reversed in Part; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

_____

[1] In order to preserve the anonymity of the minor children and related individuals in this case, involving, as it does, sensitive matters, we have abbreviated their names. *See  In re Alysia M.S.*, No. M2011-02008-COA-R3-JV, 2013 WL 1501710, at *1, n.1 (Tenn. Ct. App., filed Apr. 11, 2013).

[2] This is the second time this case has been before us.

Alan R. Beard, Chattanooga, Tennessee, for the appellant, L.A.S.

Randall D. Larramore, Chattanooga, Tennessee, for the appellee, C.W.H.

**OPINION**

**I.**

Mother and Father were never married to each other. They once lived together in Chattanooga. After the births of their two children, the parties' relationship ended in November 2010. Mother planned to move to Ohio for graduate school. In the spring of 2011, in anticipation of Mother's relocation, the parties entered into an agreed parenting plan with a long-distance parenting schedule. The plan designated Mother as the primary residential parent and split parenting time between the parties. It placed the children with Mother 221 days a year. The balance was allocated to Father. Mother moved to Ohio in June 2011. The children stayed in Chattanooga with Father until the end of the summer in order to give Mother an opportunity to get settled.

In February 2012, unsatisfied with his parenting time, Father filed a petition for modification of the 2011 parenting plan. He also sought an order finding Mother in contempt. The parties resolved the issues raised by Father at a February 2013 conference. They agreed on a plan that adjusted the day-to-day schedule, but still gave Mother primary custody and the same amount of yearly parenting time. The parties also agreed to set Father's child support arrearage at $2,527. He was also assessed a medical expenses arrearage of $7,500. Despite their agreement, Mother testified that the arrearage should have been more:

> . . . that's what we agreed on and negotiated during the mediation, but I have over $33,000 in medical bills that he has not paid for, nor has he paid for any insurance or premiums of medical bills [sic] before.

The new plan was incorporated into an order that was entered March 1, 2013.

Soon after the order was entered, Father learned that Mother worked as a licensed prostitute in Nevada. On March 12, 2013, he filed a motion for an emergency temporary custody order and temporary restraining order. A magistrate heard the matter in August 2013. The magistrate treated Father's motion as a petition to modify the March 1, 2013 parenting plan. The magistrate ruled in Father's favor, finding that a material change in circumstances had occurred and that it was in the children's best interest to designate

2

Father as the primary residential parent. Mother appealed to the trial court. The trial court held a hearing at which it heard testimony and considered documentary evidence. The evidence before the trial court was summarized by us in our first opinion in this case:

> Father testified. While the parties never married, they had dated exclusively for some period. Soon after their breakup, Father learned that Mother was pregnant. Their son was born in January 2009. At that time, Mother lived in Ohio and Father in Pennsylvania. In August 2009, Mother and Father resumed a relationship and moved to Chattanooga, Tennessee. In Chattanooga, Mother and Father lived at the maternal grandmother's home. The parties' second child, a daughter, was born in June 2010. The parties broke up in November 2010.
>
> In March or April 2011, Father met [Stepmother] through his job and they began a relationship. Father married [Stepmother] in September 2011, despite Mother's misgivings. . . . Mother and Father entered into a parenting plan in Tennessee providing for Mother to move to Ohio with the [c]hildren. However, problems developed. Father testified that in August 2011, he visited Ohio to see the [c]hildren but could only see them at their daycare. Father was refused his parenting time during the 2011 Thanksgiving holiday. In January 2012, Father could not see the [c]hildren during a visit to Ohio because the Ohio Child Services agency was investigating Mother for abuse.[3]
>
> In February 2012, Father filed a petition for contempt and modification based on the ongoing difficulties under the then existing parenting plan. In May 2012, [Stepmother] . . . gave birth to a daughter. According to Father, Mother was not receptive to the new child and even stated that Father's and [Stepmother's] daughter was not really the [c]hildren's sibling. After more squabbling over parenting time, the [c]hildren returned to Chattanooga and Father. The

---

[3] Father testified that the investigation stemmed from a preschool teacher having reported that Mother "pushed them maybe or something." However, nothing appears to have come from the investigation.

3

[c]hildren's luggage indicated that they had been in the western United States. Father did not understand what this was about. Father believed the [c]hildren had been with Mother in Ohio.

In February 2013, Mother and Father entered into a conference to resolve the petition filed earlier by Father. During the conference, Mother represented that she was working as an "independent contractor." A permanent parenting plan was agreed to and entered. In March 2013, a revelation broke. Father learned that Mother actually was working as a licensed prostitute in Nevada. Father did some research and discovered that Mother had been working as a licensed prostitute in Nevada since June 2012. Father additionally discovered that Mother had been working under the name [V.L.], a name very similar to the name of the parties' daughter. The [c]hildren returned to Chattanooga in mid-2013.

Mother testified. Mother presented her side of the controversy. According to Mother, she got deeper into debt while attending school in Ohio. Mother stated that Father did not consistently provide support for the [c]hildren. Father, as reflected in the 2013 Parenting Plan, was thousands of dollars in arrears for medical bills for the [c]hildren and child support. Mother aspired to work as a social worker but could not find any openings at first. In order to relieve her financial burden, Mother began work as a licensed prostitute at the Moonlight Bunny Ranch [(the Ranch)] in Nevada. According to Mother, the [c]hildren were not exposed to her occupation. Mother denied that the [c]hildren suffered any abuse or neglect as a result of her work as a Nevada licensed prostitute, which she maintains she undertook for justifiable financial reasons. Regarding why she did not disclose her occupation in the lead-up to the 2013 agreed parenting plan, Mother stated that she was not asked about it. By the time of trial, Mother was out of the prostitution business and doing social work in Nevada after having received her master's degree in social work and her provisional license from the state of Nevada for social work.

4

Other relevant testimony was heard by the Juvenile Court. Numerous witnesses testified to the health and well-being of the [c]hildren under Father's care. The [c]hildren have access to an extended family in Chattanooga and excellent education facilities in that area. Trial testimony was elicited about Father's snorting cocaine in his house with a woman other than his wife while the [c]hildren and his and [Stepmother's] daughter were asleep in the house. When asked where [Stepmother] was while he and his female friend snorted cocaine in his house while his children were sleeping, Father testified: "She got herself into a – she got picked up and she was in the drunk tank." Father also had cheated on [her] with another woman before the marriage was even a year old. Over the course of this matter, Father had been promoted to a management position in the restaurant business.

*C.W.H. v. L.A.S.*, No. E2014-00893-COA-R3-JV, 2015 WL 128537, *1-4 (Tenn. Ct. App., filed January 8, 2015) (our footnote three was a footnote in our summary in the first opinion).

In the first hearing before the trial court, it designated Father as the primary residential parent, provided a long-distance visitation schedule for Mother, and reduced her parenting time from 221 days annually to 90 days. On appeal, we vacated the trial court's judgment and directed the trial court "to enter a permanent parenting plan after considering all relevant factors and making a best interest analysis." *Id.* at *5. We specifically declined to determine whether the lower court "erred in finding a material change in circumstances." *Id.*

On remand, the parties were given an opportunity to offer new evidence. Neither did. Both parties put forth a proposed best interest analysis. On July 10, 2015, the trial court entered a new order, which incorporated its prior order and included a best interest analysis, holding in Father's favor. Mother again appeals to this Court.

## II.

On appeal, Mother raises the issue of whether the trial court erred in awarding custody of the children to Father. Father also raises the issue of whether the trial court erred in denying his request for attorney's fees.

5

## III.

We review the trial court's findings of fact de novo with a presumption of correctness, unless the evidence preponderates against these findings. Tenn. R. App. P. 13(d). "A trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions." *Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93 (Tenn. 2013) (citing *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007)). For this reason, "appellate courts must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings." *Id.* at 693 (citing Tenn. R. App. P. 13(d)).

We review the trial court's conclusions of law de novo with no presumption of correctness. *Id.* at 692. However, in this matter, our de novo review is subject to "the well-established principle that a trial court has wide discretion in matters of custody and visitation." *Jahn v. Jahn*, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996) (citing *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)) (italics omitted). "[T]he trial court's decision will not ordinarily be reversed absent some abuse of that discretion[.]" *Id.* at 942 (citation omitted). "A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *In re Izzabella B.*, No. M2015-00963-COA-R3-JV, 2016 WL 1650687, at *4 (Tenn. Ct. App., filed Apr. 22, 2016) (citing *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008)). "Nevertheless, discretionary decisions must be based on the applicable law and the relevant facts; accordingly, they are not immune from meaningful appellate review." *Gooding v. Gooding*, 477 S.W.3d 774, 776 (Tenn. Ct. App. 2015).

## IV.

## A.

To modify an existing parenting plan, the petitioner must prove that there has been a material change in circumstance that affects the well-being of the children and that modification is in the children's best interest. *Murray v. Murray*, No. M2009-01576-COA-R3-CV, 2010 WL 3852218, at *6 (Tenn. Ct. App., filed Sept. 28, 2010) (citing *Cranston v. Crumbs*, 106 S.W.3d 833, 839 (Tenn. Ct. App. 2003)). Tenn. Code Ann. § 36-6-101(a)(2)(B) (2012) provides the standard for establishing a "material change in circumstance:"

A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(B). To determine whether a material change in circumstances has occurred, this Court has previously considered: "(1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was known or reasonably anticipated when the order was entered; and (3) *whether a change is one that affects the child's well-being in a meaningful way*." **Kesterson v. Varner**, 172 S.W.3d 556, 567 (Tenn. Ct. App. 2005) (citing **Kendrick v. Shoemake**, 90 S.W.3d 566, 570 (Tenn. 2002)) (emphasis added). In the present matter, the trial court, in its April 16, 2014[4] and July 10, 2015 orders, found there had been a material change in circumstances of the children for three specific reasons: "because of Mother's deceit, Mother's occupation as a prostitute, and Mother's hostility toward Father and his wife." We will consider each reason separately.

Father filed a motion for emergency temporary custody on March 12, 2013, in which he asserted that the parenting plan, entered on March 1, 2013, "was secured by fraud and/or material misrepresentation or omissions." In the first appeal, we held that Father's March 12 petition "filed some two odd weeks after entry of the 2013 parenting plan, represented a motion to alter or amend the March 2013 modification of the 2011 parenting plan." **C.W.H.**, 2015 WL 128537, at *4. As a result, "the Juvenile Court properly considered evidence dating back to the entry of the 2011 permanent parenting plan." **Id.**

Mother does not dispute that in June 2012 she acquired a Nevada license to work as a prostitute. She stated that she lived in Ohio and traveled to Nevada to work at the "Moonlight Bunny Ranch." Mother disputes that, at the 2013 settlement conference, she deceived Father regarding her work as a prostitute, though she admits she did not disclose her then occupation. Instead, she testified that at the conference she stated that she worked as an "independent contractor." She maintains she was not asked about the nature or location of her work. Father's counsel emphasized the length of the settlement conference to cast doubt on Mother's claim. At trial, Father recalled the conference lasted "[a] few hours, two or three[.]" Mother at first recalled it lasted "[m]aybe an hour, I don't know." In his closing statement, Father's counsel said, "That's just stunning to

---

[4] This order incorporated a memorandum opinion entered December 5, 2013.

me that you could have a three-hour conference settlement, come out with a comprehensive parenting plan and assert that somehow you weren't hiding the fact that you're a prostitute." He added, "It just doesn't stand the straight face test." Father testified that, based on Mother's assertions at the conference, he understood she worked "as an independent contractor doing p.r.n. work, social work in Cleveland, Ohio." On the second day of trial, Father testified Mother had told him

> she was an independent contractor doing social work. And I believed, because she was living in Ohio . . . that it would be in Ohio.

Father acknowledged that, prior to entering into the agreed parenting plan, at the 2013 conference, Mother disclosed she had applied for jobs in Nevada and might move there.

The trial court did not elaborate as to exactly how Mother had deceived[5] Father. Still, appellate courts must give "great weight" to "the credibility accorded by the trial court," because "the weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trial court, which has the opportunity to observe the witnesses' manner and demeanor while testifying[.]" ***B.M.M. v. P.R.M.***, No. M2002-

---

[5] With regard to "deceit," this court has previously stated that

> The elements of misrepresentation and deceit are set out in ***Edwards v. Travelers Insurance of Hartford Connecticut***, 563 F.2d 105 (6th Cir. 1977), as follows: (1) There must be a representation of an existing or past fact and not an opinion or conjecture about future events; (2) the representation must be false; (3) the representation must be in regard to a material fact; (4) there must be proof of fraud and fraud is proven when it is shown that a false representation is made (a) knowingly, or (b) without belief in its truth, or (c) recklessly, carelessly, whether it be true or false; (5) the plaintiff must rely reasonably on the misrepresented material fact; and (6) the plaintiff must suffer damages.
>
> Each and every element must be proven in order for the [petitioners] to prevail. Fraud is never presumed. The burden is on the [petitioners] to prove a false representation of an existing or past material fact.

***Woosley v. Bailey***, No. 01-A-019112CH00470, 1992 WL 187639, at *5 (Tenn. Ct. App., filed Aug. 7, 1992).

8

02242-COA-R3-CV, 2004 WL 1853418, at *17 (Tenn. Ct. App., filed Aug. 18, 2004) (citing *In re Estate of Walton v. Young (In re Estate of Walton)*, 950 S.W.2d 956, 959 (Tenn. 1997)). The trial judge found that Mother deceived Father about her work as a prostitute.

On appeal, Father argues that "[t]he discovery of this deceit and misrepresentation clearly represents an unexpected change in circumstances," which he says warrants modification of the parenting plan. However, it is clearly recited in the cases that "[a]s a general rule, 'changed circumstances' include any material change of circumstances affecting the welfare of the child including new facts or changed conditions which could not be anticipated by the former decree." *In re T.C.D.*, 261 S.W.3d at 743-44 (citation omitted). The trial court did not make an express finding as to how Mother's deceit affected the children's well-being. Father offers none in his brief. It is clear beyond any doubt that our case law requires a court to make findings as to the "affecting the welfare of the child" issue in order to establish that a material change in circumstances has occurred. "[T]o qualify as 'material,' the change in circumstances must be '*one that affects the child's well-being in a meaningful way*.' " *Williams v. Singler*, No. W2012-01253-COA-R3-JV, 2013 WL 3927934, at *13 (Tenn. Ct. App., filed July 31, 2013) (emphasis added; internal citation omitted). Without describing *how* Mother's deceit affected the welfare of the children, the evidence is insufficient to support a finding that a material change in circumstances occurred. There is no evidence in this record showing that Mother's occupation as a licensed prostitute in Nevada has affected the children. Therefore, assuming solely for the purpose of argument, that Mother was deceitful, this, standing alone, does not constitute a material change in circumstances without an "effect" finding.

We next consider the trial court's finding that "Mother's occupation as a prostitute" amounts to a material change in circumstances. Mother argues that "[t]here was never even an allegation of specific harm to the children, or any basis to conclude, after the proof presented, that the children, ages 3 and 4, had been adversely affected by the [M]other's temporary work" as a prostitute. Therefore, she argues, Father did not meet his burden of proof under *Kesterson* to establish that a material change in circumstances had occurred.

Father asserts that Tennessee has a clear, long-standing public policy against prostitution, citing Tenn. Code Ann. § 39-13-513, *Childress v. City of Nashville*, 35 Tenn. 347 (1885), and *State v. Friedman*, No. M2004-01266-CCA-R3-CD, 2005 WL 1353313 (Tenn. Crim. App., filed June 8, 2005). Father argues that, in light of Tennessee's public policy against prostitution, "the behavior at issue in this case[ ] has been found to be *per se deleterious . . .*" such that we "*should presume the danger* to the

9

children from being exposed to the practice." (Emphasis added.) Nowhere in Father's brief does he establish how the children have been "exposed to the practice" of prostitution.

In the hearing before the juvenile court magistrate, Mother admitted that she had worked as a prostitute. When the case was before the juvenile court, she denied that she was still engaged in prostitution. Mother asserted that, on September 10, 2013, she began working in Nevada as a social worker, the professional field in which she earned a master's degree. Mother entered into evidence copies of her provisional license from the Nevada State Board of Examiners for Social Work, her earnings statements from her work as a social worker,[6] an employee benefits summary from that employment, her resume, diplomas memorializing her bachelor's and master's degrees, and academic awards. The earnings statements in evidence indicate that from September 2013 until trial, Mother worked about ninety hours every two weeks. Still, the trial court found:

> . . . Mother testified that she is now working full-time as a social worker in Nevada, although the Court does not find this testimony to be credible. Although Mother testified that she has no plans to work as a prostitute any more, there apparently was no other reasonable tie for her in Nevada, and all of Mother's family is in Chattanooga. Father's wife's extended family is also in Chattanooga. The Court finds that Mother lacked integrity on several issues, including her current employment.

Mother argues in her brief that the "trial court . . . seems to presume unequivocally that Mother is still engaged in prostitution[.]" We agree with Mother on this point. As we will address in more detail later in this opinion, the trial court's best interest analysis generally relies on a finding that Mother was still engaged in prostitution. This can be seen from the trial court's statements, *e.g.*, "Mother's employment may require her to be

---

[6] Mother did not state the name of her current employer at trial. However, the "earnings statements" in evidence lists her employer as the "The MENTOR Network" with a mailing address in Edina, Minnesota. The Mentor Network's website, which displays the same corporate logo as the one that appears on Mother's earnings statement, indicates it is "a national network of local health and human service providers in 35 states offering an array of quality, community-based services to adults and children with intellectual and developmental disabilities[.]" *See* http://thementornetwork.com/ (last visited Oct. 4, 2015). The same website indicates the company has a location in Carson City, Nevada. *Id.* Mother's earnings statement lists her address as Dayton, Nevada, a city located fewer than fifteen miles from Carson City. *See* https://www.google.com/maps (last visited Oct. 5, 2016).

out at all hours of the night" and "[s]he has no plans of how to shield the children from sexually inappropriate material which would be readily available at any time through her line of work."

As we have stated earlier in this opinion, appellate courts must give "great weight" to a trial court's assessment of witnesses' credibility. *B.M.M.*, 2004 WL 1853418, at *17. "However, the trial court's impressions are no substitute for actual findings of fact and conclusions of law in the record." *Williams*, 2013 WL 3927934, at *13. Here, other evidence – a significant amount of which is documentary in nature – also supports a finding that Mother no longer works at the Ranch. Kasandra Shepard, director of the Carson Lanes Day Care and Learning Center, the children's daycare in Carson City, Nevada, testified on Mother's behalf. Shepard developed a friendship with Mother. She expressed in her testimony that Mother had quit working at the Ranch, that she had no reason to believe Mother would be untruthful about quitting the Ranch, and that she has visited Mother's current place of "social work" employment where she observed Mother working as a social worker. At most, the other testimony at trial only *speculated* on the *possibility* Mother might *someday* resume work as a prostitute to help resolve a *hypothetical future financial crisis*. This is speculation based on speculation based on speculation. On the subject under discussion, Father testified as follows:

> Q Would you feel confident that she might not revert back to
> that profession as soon as these proceedings are over?
>
> A I don't think she would – I think she would go back to it if
> money was – it's all about money.

According to Mother, her reasons for working at the Ranch were financial. She testified that before she started working there, she owed approximately $33,000 in medical bills associated with treatment for her children, which she struggled to pay while completing her master's program in social work and searching for full-time employment in her field. She also pointed to Father's lack of financial support for the children. At the February 2013 settlement conference, Father agreed he owed about $10,000 in medical and child support payments for the children. When questioned about returning to or continuing work at the Ranch, Mother testified as follows.

> Q Are we to infer from that that it shows a lack of values, a
> fundamental lack of moral character to behave as a prostitute?
>
> A I, unfortunately, in my opinion, sacrificed myself in order
> to provide for my family, and that's what I did. I never said I

11

was happy about it. I never said I was proud of it, but I did what I needed to do to take care of my children with little help from [Father].

Q So when the fiscal need presents itself, you're willing to throw those values in the bag, throw them in the trunk, and go about your lucrative financial business?

A That's not what I said.

Q Right?

A That's not what I said.

Q Well, you indicated that it evidences a lack of values; correct?

A That's what I have to do is sacrifice myself. As parents you sacrifice certain things, and that's what I had to choose to sacrifice. Moving forward, never, not again. I never even – like I said, I'm not going to sacrifice not having my children with me, it's not worth it. My children are my world.

On cross-examination, Mother gave two reasons why she would not work in prostitution again – learning that it could jeopardize whether she would have custody of her children and the Nevada social worker's code of ethics, which, she says, prohibits prostitution.

The trial court found that "[a]t the time of the trial, websites were still actively seeking prostitution business using her [Mother's] image." The evidence includes a print-out of an undated marketing website that states, next to an image of Mother, appointments are available on nights and weekends. Mother identified the provocative material admitted in evidence as part of the Ranch's marketing scheme. Mother testified that she removed from the internet any marketing pages related to her involvement in prostitution. She said, "[I]f it's still up there, then it's up there without my knowledge."

Mother testified at trial that she no longer worked at the Ranch and, instead, was employed as a social worker. As previously noted by us in this opinion, her friend, Shepard, testified to observing Mother working as a social worker at her current employment. Furthermore, and as also stated by us in this opinion, Mother submitted

copies of her earnings statements from her new job, as well as evidence of her qualifications for such a job, including copies of her diplomas and provisional Nevada license to work in social work. There was no testimony indicating that, at the time of trial, Mother was still working as a prostitute. Still, the trial court concluded "that Mother lacked integrity on several issues, including her current employment." We hold that the related testimony and the documentary evidence in the record substantiate Mother's claims about her current employment. Accordingly, we hold that the evidence preponderates against a finding that Mother was still working as a prostitute.

Father asks that we find Mother's work as a prostitute to be "per se deleterious" for the children. We recognize that, in order to make out a material change in circumstance, one does not have to show a "substantial risk of harm to the child." Tenn. Code Ann. § 36-6-101(a)(2)(B). Rather, one must show "whether a change is one that affects the child's well-being in a meaningful way." *Kesterson*, 172 S.W.3d at 567. Accordingly, in a previous case, when a father sought custody due to the mother's infidelity, we held that

> her adulterous relationship cannot be the only basis for the Trial Court's decision regarding custody of the [c]hildren. A 'parent's sexual infidelity or indiscretion does not, *ipso facto* disqualify that parent from receiving custody of his/her child." *Varley v. Varley*, 934 S.W.2d 659, 666-67 (Tenn. Ct. App. 1996). "When the activities of the parent involve neglect of the children, however, such neglect is a consideration in determining the child's best interests." *Id.*

*Nelson v. Nelson*, 66 S.W.3d 896, 902 (Tenn. Ct. App. 2001). Additionally, in *Berry v. Berry*, we considered a post-divorce child custody matter in which the father sought a change in custody because the mother began engaging in same-sex romantic relationships. He argued that it represented a material change in circumstance. We found the evidence insufficient to establish "the mother's homosexuality has had or will have an effect on the child's well-being in a meaningful way." *Berry v. Berry*, No. E2004-01832-COA-R3-CV, 2005 WL 1277847, at *2 (Tenn. Ct. App., filed May 31, 2005). As a result, we found a change in custody was not warranted, stating:

> A parent's sexual orientation can be a factor that the trial court should consider in making a custody decision, but it does not control the outcome of the case absent evidence of its adverse effect on the child. Homosexuality is not a *per se*

13

bar to custody. The key consideration is whether a parent's
sexuality has a negative effect on a child's welfare.

*Id.* at **3 (citations omitted); *see also **Murray v. Murray**, No. M2009-01576-COA-R3-CV, 2010 WL 3852218, at *7 (Tenn. Ct. App., filed Sept. 28, 2010) (finding that, unlike **Berry**, the evidence there supported that a material change in circumstances had occurred because there is "at least some evidence that [m]other's dalliance with drugs and with some of her sexual partners did have an adverse effect on the child"). In both **Nelson** and **Berry**, a petitioner parent asked us to find the other parent's actions to be an "ipso facto disqualif[ication]" from receiving custody or a "per se bar to custody." **Nelson**, 66 S.W.3d at 902; **Berry**, 2005 WL 1277847, at *2. In both instances, we declined to do so without evidence as to how the conduct at issue adversely affected the child. *Id.* In the case now before us, Father – similar to the petitioners in **Berry** and **Nelson** – asks us to find Mother's actions "per se deleterious" while presenting no evidence on how those actions affected or will affect the children. This we decline to do.

Mother engaged in legal prostitution.[7] She testified the children generally stayed with Father or other family when she traveled from Ohio to Nevada to work at the Ranch. There was a period of time – from February to June 2013 – that the children did travel with her from Ohio to Nevada. She testified that, on those occasions, the children stayed in licensed daycare while she worked at the Ranch. She asserts that the children never went to the Ranch and she did not tell them about her work there. Contrary to Mother's testimony, Father testified that P.H. once accompanied Mother to the Ranch to pick up a paycheck. He stated that the child waited in the car while Mother went inside to pick up her check. Father added that P.H. thought the Ranch was an animal shelter. Mother denied Father's assertion that she took the child to the Ranch. The trial court did not make a finding that Mother ever took the children to or near the Ranch. Father did not repeat the claim in his brief on appeal.

The case now before us differs from **Burris v. Burris**, No. M2009-00498-COA-R3-CV, 2010 WL 1404385, at *4-5 (Tenn. Ct. App., filed April 7, 2010), another child custody dispute in which the mother engaged in prostitution. In that case, Mother was arrested for illegal prostitution in Nashville while she was still married to the children's father. *Id.* at *1. There, we found the children had "been confronted with publicity relating to their mother's arrest," the mother "allowed another woman, also engaged in prostitution, to come to the family home" to share a meal with the children, and the mother had taken nude photographs of herself "in various places throughout the parties' home" to advertise her services. *Id.* at *4-5. We also found the evidence supported the

---

[7] *See* Nev. Rev. Stat. Ann. §§ 201.354; 201.295.

trial court's finding that the mother "engaged in phone sex while in bed with the child . . . [and] failed to supervise the children[.]" *Id.* at *5. In the present case, there was no finding that the children were exposed to Mother's work at the Ranch or neglected by her while she was working there.

Father also raises the issue of the online materials that feature Mother's image to advertise prostitution. Previously, we have declined to find the existence of provocative online photographs of a parent to be per se harmful to a child's morals in a case involving a heightened standard of clear and convincing evidence. In the case of ***In re Alysia M.S.***, 2013 WL 1501710, at *7, this court considered, *inter alia*, whether a child was dependent and neglected for reasons of Mother's "immorality." In that opinion, we stated:

> The Mitchells [the parties seeking to adopt] zealously gathered and presented past postings from [m]other's social networking pages such as photos of her in various states of undress next to references to "private parties" and bringing other "hot chicks." The postings, argue the Mitchells, "seem to indicate that [mother] may be involved in some form of prostitution." This bare allegation is unconvincing, and [m]other testified that she had never worked topless, or in the sex industry, or in any form of prostitution, that she no longer organized parties, and that she had never organized parties involving sex. Mother attempted to delete her social networking pages that contained the photos, though they were discoverable on the internet at the time of the circuit court hearing. *More importantly, the record contains no evidence that young Alysia [the child] had seen or knew about [m]other's past internet postings. In this case, we cannot simply assume that she will be exposed to them in the future, nor can we predict the effect, if any, such exposure would have on her morals. The Mitchells' assertion that "the photos speak for themselves" does not amount to clear and convincing evidence of [m]other's unfitness to properly care for her child or of any injury or danger to Alysia's morals.*

*Id.* (emphasis added). To meet the burden of "clear and convincing," the petitioner must establish "there is no serious or substantial doubt about the correctness or conclusions to be drawn from the evidence." ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002) (citation and internal quotation marks omitted). However, the standard now before us is less stringent. Here, the petitioner, Father, must only establish a material change in

15

circumstances by a preponderance of the evidence. Further, distinct from *In re Alysia M.S.*, in the current case, Mother does not dispute that she worked as a licensed prostitute and that the provocative images are in fact related marketing materials.

Father asks us to presume harm to the children based on Mother's previous work and any provocative images of her available on the internet. As the petitioner, he bears the burden of proof. To establish that a change in circumstances is material, the evidence must establish the effect a parent's conduct has on a child's well-being. *Williams*, 2013 WL 3927934, at *13. Father did not establish how Mother's behavior "affect[ed] the child's well-being in a meaningful way." *Galaway v. Galaway*, No. M2015-00670-COA-R3-CV, 2016 WL 1291966, at *4 (Tenn. Ct. App., filed Mar. 31, 2016) (citation and internal quotation marks omitted). Because Father failed to establish the children were affected, we must hold that the evidence preponderates against the finding that Father established that Mother's work as a licensed prostitute met the legal standard for "a material change in circumstances."

Finally, the trial court found that a change in circumstances occurred because of "Mother's hostility toward Father and his wife."

Mother and Stepmother first met in the spring or winter of 2011, prior to the original custody order. Mother claims she was a patron at a restaurant where Stepmother worked when she learned of Stepmother's relationship with Father. Mother suspected Father and Stepmother's romantic relationship overlapped hers and Father's. Stepmother stated that a verbal altercation occurred in or about the restaurant.

Since the entry of the June 2011 order, Father and Stepmother have married. They have a child of their own. Incidents of hostility have continued involving Mother, Father, and Stepmother. For example, when Father visited Ohio for his birthday in August 2011, Mother did not allow him to take the children from their daycare after learning that Stepmother was with him. Immediately prior to Father and Stepmother's wedding, an incident occurred over emails. In that instance, Mother received an email message that was sent from Father's email account. Mother suspected that, while it was on Father's email account, it was actually sent by Stepmother. Mother, in an attempt to provoke Stepmother, responded to the email by sending a picture of her own naked breast. Shortly thereafter, Mother, at the last minute, would not allow the children to participate in Father and Stepmother's wedding. At trial, the court admitted into evidence a voicemail message from Father that he left on Mother's phone in which he instructed her to "Answer your God-d__n f___g phone." Mother described Father as "very aggressive" in the message and said it "concerned" her. She explained that she had not answered because she was at a museum with the children. Mother has "blocked" the receipt of

email and cell phone text messages from Father and Stepmother due to what she described as harassment. For similar reasons, she blocked the receipt of phone calls from Stepmother, but she has allowed calls from Father to communicate with and about the children.

The children's maternal grandmother testified that she received inappropriate emails from Stepmother in 2012 and now prefers not to communicate with her. Finally, Mother stated that, on several occasions, she had been denied phone visits with the children when they were in Father's care in 2013.

As we included in the first appeal of this matter, the juvenile court judge made the following statements at the close of trial:

> [Father] and [Mother] . . . . [b]oth you parents need to grow up and put these children first before yourselves. This won't be part of my order, but frankly, I don't like either parent[ ] for the absolute best option for these children. I think you both need to grow up. Love her or hate her, love him or hate him, you-all brought children into this world together and that's not going to change, and all I heard through testimony, through written evidence, through recorded phone calls is vile, combative, just contradictory to having your children's best interest, and I'm telling you both you got to grow up. You got to look out for these children, not just for the next 13 years for [your son] or 16 years for [your daughter], forever you-all are bound together because you brought these children into this world together, and so you're going to have to talk, you're going to have to get along. You're going to have to get along with his wife as much as you hate her. She is the stepmom of these children as of today. That might change next year, that might not ever change, I don't know. But if you love your children, you're going to have to find a way around that, and I could say some similar things to you. You-all are going to have to learn to communicate.

*C.W.H.*, 2015 WL 128537, at *3.

Based on all of this, we hold that the evidence does not preponderate against the trial court's factual findings pertaining to Mother's hostility toward Father and Stepmother. In the trial court's best interest analysis, the court cited several examples of

how Mother's hostility affected the children. It should be noted, however, that the evidence indicates the hostility between the parties was mutual. When all of the evidence pertaining to "hostility" is considered, we hold that the evidence does not preponderate against the trial court's finding that Mother's hostility constitutes a material change in circumstances. Because we have found such a change, we proceed to a best interest analysis. **Murray**, 2010 WL 3852218, at *7.

**B.**

In child custody cases, "the needs of the children are paramount; the desires of the parents are secondary." **In re T.C.D.**, 261 S.W.3d at 742 (citing **Shofner**, 181 S.W.3d at 715-16). "[Q]uestions related to custody and visitation should be directed toward[ ] promoting the child's best interest by placing him [or her] in an environment that will best serve his [or her] physical and emotional needs." **Id.** at 742-43. Tenn. Code Ann. § 36-6-106(a) (2012)[8] provides as follows:

> . . . In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in subdivisions (a)(1)-(10), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:
>
> (1) The love, affection and emotional ties existing between the parents or caregivers and the child;

---

[8] This matter originated on February 28, 2012 when Father filed a petition to modify the existing parenting plan. The parties settled that petition and the trial court subsequently entered an order. Within two weeks, Father filed a motion seeking emergency custody. Previously, we determined that was a Tenn. R. Civ. P. 59 motion to alter or amend. **C.W.H.**, 2015 WL 128537, at *4. We also "note[d] that the Tennessee General Assembly has consolidated and modified the multiple best interest factors at Tenn. Code Ann. § 36-6-106. These changes were effective July 1, 2014. The final judgment in this case was entered April 2014." **Id.** On remand, the trial court conducted a best interest analysis using the updated version of the statute. That version lists fifteen – rather than ten – factors to be considered for best interest. The applicable version of the statute is the one that was current when the original petition was filed February 28, 2012. The more recent version of the statute does not apply.

(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment[;]

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers;

(6) The home, school and community record of the child;

\* \* \*

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers

to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

"Determining a child's best interest is a 'fact-sensitive inquiry' that does not call for 'rote examination of each of the [relevant] factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case.' " ***In re William K.***, No. M2014-01872-COA-R3-JV, 2015 WL 6164849, at *3 (Tenn. Ct. App., filed Oct. 20, 2015) (citing ***Solima v. Solima***, No. M2014-01452-COA-R3-CV, 2015 WL 4594134, at *4 (Tenn. Ct. App., filed July 30, 2015)).

The trial court found the best interest factors favored Father. However, as previously noted by us, much of the trial court's best interest analysis relies on the finding that Mother's work in prostitution was ongoing. The trial court included the following in its analysis:

> She could be working at all hours of the day and night, and maintains an internet site promoting herself for the purpose of creating opportunities to engage in prostitution. At the time of the trial, websites were still actively seeking prostitution business using her image. She lives in an area where no family would be able to assist her should she be called out for an appointment at night. Further, she offered no proof that she would shield the children from illicit material or that she would provide a suitable babysitter should she be away from home at night. Mother states she has no regrets about her occupation, but her actions do not match her words, as she has further attempted to convince the Court that she is now working as a social worker. It seems that the children would likely be exposed to sexually explicit material, a fact which Mother shows little to no concern for. She has no plan of how to shield the children from sexually inappropriate material which would be readily available at any time through her line of work. She was more concerned about hiding her employment in order to secure an agreement from the Father to allow her to take the children to live in Nevada with her. The children should not be subject to material they would have no capacity to fully understand. . . .

> [M]oving the children to Nevada where they have no family
> and where the Mother may be engaged in an immoral
> profession, is contrary to the children's best interests. . . . [I]t
> is unknown whether people who frequent the home or
> business of the Mother may be of negative character and may
> be exhibiting behavior that is contrary to the best interests of
> the children. . . .
>
> The Mother's employment may require her to be out at all
> hours of the night, and she has offered no evidence of how the
> children would be taken care of during those times. . . .

As previously noted, Mother testified that she no longer works at the Ranch and had attempted to take down all advertising material that used her image. While the trial court found Mother not credible on the issue of whether she was still working as a prostitute, we hold that the evidence, including the oral testimony and documentary evidence, preponderates against the trial court's credibility determination. There is significant and substantial evidence supporting the conclusion that Mother is no longer working as a prostitute. The court admitted into evidence earnings statements from Mother's current employment as a social worker, as well as copies of her provisional Nevada social worker's license, and related diplomas and academic awards. As previously noted, there was no testimony at trial indicating that she was currently working as a prostitute. The fact that the Ranch is still using her likeness as a marketing tool – something over which she may not have had any control – does not outweigh the evidence to the contrary.

The trial court found Father to be more likely to provide for the children's food, clothing, medical care, education and other necessary care. The trial court concluded this largely based on Father's behavior since the children came into his custody in 2013. Since then, he has enrolled the children in school, was promoted from bartender to restaurant manager, provided the children with stable housing, and now maintains health insurance for the children. The lower court also credited him with identifying a problem with V.H.'s speech. Since then, V.H. has undergone a speech assessment; she receives treatment twice a week through her school. Emily Rebecca Nasca, the director of preschool at V.H.'s school, stated at trial that V.H.'s speech problem is "very typical and probably 30 percent of our kids go to speech." The trial court noted "Mother offered no proof related to addressing the child's speech issue, or the children's educational needs and developmental needs." The children were ages three and four when they left Mother's care. During the time the children were in Nevada from February to June 2013, they attended a licensed day care. Mother testified that she has researched area schools in

Nevada, and taken steps toward applying for a Montessori school there. Nasca testified that Mother had contacted her to ask about concerns related to V.H.'s speech.

Regarding this factor, we find it significant that, at the February 2013 settlement conference, Father agreed that he was approximately $10,000 behind in child support and medical payments for the children. The trial court did not include this fact in its best interest analysis. Mother cited her financial burden and father's inconsistent support as the reason she began work at the Ranch. Therefore, despite his efforts to provide for the children while in his care, Father's arrearages do not support a finding that, as compared to Mother, he has done a more adequate job of providing the children with "food, clothing, medical care, education and other necessary care[.]"

There is little evidence as to who will frequent Mother's home in Nevada. Mother testified at trial that she had been dating a man for more than a year, but he was unavailable to testify due to his work schedule. Ms. Shepard, the director of the children's Nevada daycare and her friend, did testify. Two of Stepmother's sisters and a brother-in-law testified at trial as to their relationships with Father, Stepmother, and the children, and the family friendly activities they enjoy together, such as going to parks and traveling on family vacations. In addition to this testimony, the court found, "It was also stated that [Stepmother] was in jail for an alcohol related crime and during the time she was incarcerated Father invited a female friend over and they used cocaine while the children were asleep upstairs." Shortly thereafter, the trial court concluded

> [t]he Court has no way of fully knowing the character of the people who would be frequenting the home of the Mother, and Mother offered no proof that the people frequenting her home were of sound character and would not be committing acts contrary to the children's best interests. *Therefore, [this factor] weighs in favor of the Father, who was able to provide proof of the nature of the people who frequent the home of the children . . . .*

(Emphasis added.) The evidence does not support the trial court's finding on this factor. Father admitted in his testimony that in January 2013, Stepmother left their home after an argument. "[S]he got picked up and she was in the drunk tank," according to his testimony. Father added that "[s]he had gotten picked up for public intoxication and disorderly conduct." Upon learning this, Father – around midnight – called a female friend because, he said, her grandmother was an attorney and he sought advice about Stepmother's incarceration. Later that night, the woman arrived at Father's home with cocaine. Father and the woman snorted cocaine in the family home while the children

and their half-sibling were asleep there. The next morning, Father picked up Stepmother. The evidence does not support a finding that this factor weighs in Father's favor.

The trial court also found "Mother does not have the children's best interest[ ] in mind when she uses a version of her daughter's name as her alias for prostitution purposes. Mother worked at [the Ranch] and her professional name is '[V.L.],' a name adopted from her daughter's name[.]" Mother testified that the alias she used at the Ranch was intended as a modification of the name of a famous actress and that her intention was to be "discrete[.]"

The trial court found, "The Father is clearly more willing and able to facilitate a relationship with the Mother than the Mother is with the Father, mainly due to Mother's disdain for Father's wife." The trial court cited, for instance, that Mother would not let the children participate in Father and Stepmother's wedding. The trial court concluded that

> [i]f the Mother went so far as to disallow the children from participating in the Father's wedding due to her inability to serve the children's best interests over her own, this Court is very concerned as to what her actions may be if she had the ability to make the majority of the decisions for the children.

The evidence indicates Mother, at times, has interfered with Father's visitation due to her hostility toward Stepmother and Father. Mother testified at the December 2013 trial that since the children returned to Tennessee in June 2013, she has not received her allowed number of phone visits. She testified that despite her attempts to call, some weeks she got two phone visits with the children, in other weeks only one, and in two weeks she received none. "We recognize the importance of the primary residential parent's willingness to support the other parent's relationship with their child; on numerous occasions, we have affirmed a change in the designation of primary residential parent where the evidence shows that the current primary residential parent has consistently interfered with the other parent's relationship with the child[.]" *Williams*, 2013 WL 3927934, at *14. In this instance, each parent at times has made it more difficult for the other to maintain a relationship with the children.

Multiple witnesses testified that the children appear happy and well-adjusted. The "love, affection and emotional ties existing between the parent[s] . . . and the [children]" are undisputed. Mother was designated as the children's primary residential parent in June 2011. In June 2013, the children began to primarily reside with Father. After P.H.'s birth in January 2009, Mother and P.H. lived in Ohio while Father lived in Pittsburgh.

Father asserts that when they moved to Chattanooga together in August 2009, he was a "stay-at-home dad." Sometime before V.H.'s birth in June 2010, Father resumed work outside the home. Following this, he and Mother shared parenting responsibilities until Mother moved to Ohio in June 2011. At the time of trial, Mother has been the children's primary residential parent for more of their life. When considering a request to modify a child's primary residential parent, "courts . . . emphasize the importance of continuity in the child's life, and so are normally disinclined to change the original designation." *Williams*, 2013 WL 3927934, at *15 (quoting *S.A.M.D. v. J.P.D.*, No. W2011-01256-COA-R3-CV, 2012 WL 5266194, at * 18 (Tenn. Ct. App., filed Oct. 25, 2012)) (internal quotation marks omitted). As a result, "there is a strong presumption in favor of continuity of placement of a child." *Id.* (quoting *Morris v. Morris*, No. M2001-02275-COA-R3-CV, 2002 WL 31059222, at *2 (Tenn. Ct. App., filed Sept. 17, 2002)) (internal quotation marks omitted).

The trial court found, "only one witness testified on behalf of the Mother and her ability to parent," and that witness "had only seen Mother in the context of picking her children up from daycare, and had not actually observed the Mother's parenting ability." However, the witness, Shepard, testified she is friends with Mother. Their children are similar in age. Shepard testified to observing Mother with the children at the daycare, as well as on outings to parks. She described Mother as "very attentive to the kids" and "always prepared." Knowing of Mother's work at the Ranch, she testified she would have no hesitation "at all" for Mother to watch her children.

The trial court further found "several of the applicable factors control this case more than others" – namely that the children's life is more stable with Father, Father's proximity to the children's extended family, and the length of time Father has been the children's primary caretaker. The children, now ages six and seven, primarily have resided with Father since mid-2013. Stepmother is a stay-at-home mom. Many of Mother and Stepmother's extended family live in Chattanooga. The children have begun school programs there. Testimony indicated the children have developed relationships with classmates, Stepmother's extended family, and the children's younger half-sister. The trial court also listed Father's indiscretions, namely that he admitted having an affair during his first year of marriage. Stepmother slapped him when she learned of the affair. By the time of trial, based on Mother's testimony and pictures in evidence, Mother now has a home in Nevada with space for the children. She has a steady job as a social worker that she enjoys, with an annual gross salary of approximately $40,000. At trial, Mother and Father each had health insurance.

Tenn. Code Ann. § 36-6-106(a) allows us to consider "all other relevant factors" in addition to those listed in (a)(1)-(10). We note that the version of the statute applied

24

by the trial court included as a factor the "[t]he *moral* . . . fitness of each parent as it relates to their ability to parent the child. . . ." (Emphasis added.)  As previously noted by us, the version of the statute current when Father filed a petition to modify in 2012, did not list a parent's "moral" fitness as a factor.  In evaluating the Mother's "moral" fitness, the trial court found that "Father is more likely to do everything in his power to appropriately shield [the children] from things that are not age-appropriate."  However, Father's own testimony established that he used cocaine while the children were in the home with him.  Comparatively, the trial court did not find Mother exposed the children to anything that is not age appropriate.  Still, the trial court found this factor weighed in Father's favor, in part, based on a finding that Mother still worked in prostitution.

Mother's work at the Ranch was legal in Nevada, though her actions clearly are at odds with the established public policy of Tennessee.  Tenn. Code Ann. § 39-13-513(b)(1) (2012) ("[p]rostitution is a Class B misdemeanor"); **Friedman**, 2005 WL 1353313, at *4 ("the State has a control over the morals of its citizens and this extends to making prostitution a crime").  However, "[c]ustodial arrangements should not be made with the goal of punishing a parent for misconduct."  **Williams**, 2013 WL 3927934, at *16 (citing **Barnhill v. Barnhill**, 826 S.W.2d 443, 453 (Tenn. Ct. App. 1991)).  Father admits that Mother disclosed at the 2013 settlement conference that she was applying to jobs in Nevada and might move there.  The parties' agreement permitted Mother to spend 221 days each year with the children, while Father was given the remaining 144 days.  This was the same division of parenting time as in their 2011 long-distance parenting plan.  Father sought to modify the plan after learning Mother worked as a prostitute.  He stated in his brief that Mother "has caused this litigation by her engagement in the practice of prostitution[.]"  The current plan reduces Mother's parenting time to 90 days per year.  We note that Tenn. Code Ann. § 36-6-106 implores us to craft a custody arrangement that allows "both parents to enjoy the maximum participation possible in the life of the child," consistent with the best interest factors.  Additionally, the trial court increased Mother's share of long-distance transportation costs.  Under the 2011 plan, Mother and Father shared these costs equally.  In the March 1, 2013 plan, the parties agreed "Father shall pay all transportation costs until his child support arrearage/medical expense obligation is resolved.  Afterwards, the parents shall split costs equally."  However, the trial court now orders Mother to pay 75 percent of transportation costs while Father will pay 25 percent.

It is clear that both parents at times have acted in a manner that failed to put the children's interest first.  However, we find the trial court relied heavily on a finding that Mother's work in prostitution was ongoing to reach its conclusion that it is in the children's best interest to designate Father as the primary residential parent.  We find the evidence does not support this conclusion.  The trial court also failed to take into account

Father's significant child support and medical arrearages of $10,027. We also find it significant that Father admitted to using illegal drugs in the family home when the children were present. For all of these reasons, we hold that the evidence preponderates against the trial court's finding that the best interest of the children mandates that Father be the children's primary residential parent. For reasons stated above, the trial court abused its discretion in designating Father as the primary residential parent.

## V.

Father appeals the trial court's decision to deny his request for attorney's fees. He asserts that he is entitled to such an award pursuant to Tenn. Code Ann. § 36-5-103(c), which allows for an award of reasonable attorney's fees incurred in a child custody matter to "the plaintiff spouse . . . from the defendant spouse, and the spouse . . . to whom the custody of the . . . children, is awarded[.]" We note that the decision to grant attorney's fees is largely within the discretion of the trial court. *Galaway v. Galaway*, No. M2015-00670-COA-R3-CV, 2016 WL 1291966, at *5 (Tenn. Ct. App., filed Mar. 31, 2016) (citation omitted). Absent an abuse of discretion, we will not interfere. *Id.* We find no such abuse on this issue. Furthermore, after our decision, Father is no longer the prevailing party.

## VI.

The judgment of the trial court designating Father as the primary residential parent is reversed. Mother is hereby designated as the children's primary residential parent. The permanent parenting plan incorporated in the trial court's order of July 10, 2015, is hereby vacated and held for naught. We hereby reinstate the permanent parenting plan incorporated into the trial court's order of March 1, 2013. We further decree that the children will be delivered to Mother in Nevada by way of a commercial air flight no later than twenty days following the entry of this order. If Father has not paid his arrearages in full as of the date of entry of this order, he will be solely responsible for the children's airfare to Nevada. If, as of the date of entry of this order, Father does not owe any arrearages, each of the parties will be responsible for and pay one-half of the airfare. Costs on appeal are taxed to Father, C.W.H. This case is remanded to the trial court for enforcement of the trial court's judgment as changed by this opinion. Since we have reversed the trial court's judgment, costs at the trial court level are also assessed against C.W.H.

_____
CHARLES D. SUSANO, JR., JUDGE

26